UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

SECURITIES AND EXCHANGE          §
COMMISSION                       §
                                 §
v.                               §          CIVIL NO. 4:20-CV-972-SDJ
                                 §
RONNIE LEE MOSS, ET AL.          §

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff Securities and Exchange Commission's ("Commission") Motion for Default Judgment Against Defendants Ronnie Lee Moss, Jr.; Royal Oil, LLC ("Royal"); and Catalyst Operating, LLC ("Catalyst"). (Dkt. #16). Having considered the motion, the record, and the applicable law, the Court concludes that the motion should be **GRANTED**.

## I. BACKGROUND

Between February 2014 and March 2018, Moss and his companies—Genesis E&P, Inc. ("Genesis"); Royal; and Catalyst—allegedly raised more than $5.7 million from investors through fraudulent means. (Dkt. #1). According to the Commission, they made false and misleading statements and omissions in the offer and sale of securities in the form of oil-and-gas limited partnerships and so-called "bridge loans." (Dkt. #1 ¶¶ 2–4, 27, 48). These misstatements included claims in sales materials that prior oil-and-gas projects had been commercial successes when, in fact, none had been profitable. (Dkt. #1 ¶¶ 20, 27, 48).

The sales materials, which were distributed to investors, also contained misleading statements about project management and consulting experts. (Dkt. #1

¶¶ 28–29). The materials listed a low-level cold caller as the President of Genesis and David Glass as the company's CEO when, in reality, Moss ultimately controlled operations at the company. (Dkt. #1 ¶¶ 28–29). A person named Dan Morrison, who was described as having extensive management experience in the oil-and-gas industry, was touted as a "Director" of Royal. (Dkt. #1 ¶ 29). But according to the complaint, Morrison was never a director of Royal and never performed any consulting services for the partnerships. (Dkt. #1 ¶ 29). Moss and his companies also allegedly withheld key information from investors, such as Moss's prior conviction for securities fraud. (Dkt. #1 ¶ 30).

In addition to drafting the sales materials, Moss trained and supervised telephone solicitors who cold called investors and, at Moss's direction, promised them a guaranteed minimum return of 30% in the Genesis projects. (Dkt. #1 ¶¶ 23–24, 29, 31). Moss made similar claims through Royal, promising bridge-loan investors a return of their principal investment plus 20% interest within three to twelve months. (Dkt. #1 ¶¶ 36–43). And through the Catalyst offerings, Moss told prospective investors that the oil wells were generating "double digit returns" for current investors. (Dkt. #1 ¶¶ 44–52). The Commission asserts that Moss personally misappropriated most of the funds raised from investors and that no investor obtained a return on their investment, resulting in substantial losses. (Dkt. #1 ¶¶ 2–4); (Dkt. #16-1); (Dkt. #16-2).

In December 2020, the Commission brought this action against Moss, Genesis, Royal, and Catalyst for violations of Section 17(a) of the Securities Act of 1933

("Securities Act"), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b–5 thereunder. (Dkt. #1 ¶¶ 62–69). The Commission also claims that Moss violated Section 15(a) of the Exchange Act. (Dkt. #1 ¶¶ 58–61). To remedy the alleged violations, the Commission seeks permanent injunctions, disgorgement plus prejudgment interest, and civil penalties. (Dkt. #1 at 15).

Shortly after bringing this action, the Commission filed an unopposed motion to enter judgment against Genesis. (Dkt. #3). As part of a settlement with the Commission, Genesis consented to permanent injunctions prohibiting it from violating Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b–5. (Dkt. #3-1). Genesis also agreed to the imposition of a civil penalty against it in the amount of $192,768. (Dkt. #3-1). The Court granted the Commission's motion, (Dkt. #11), and entered final judgment against Genesis, (Dkt. #12).

Based on the record, answers from the remaining Defendants—Moss, Royal, and Catalyst—were due on March 5, 2021. (Dkt. #7, #8, #9). To date, they have not answered or otherwise filed a responsive pleading. On April 26, 2021, the Court ordered the Commission to either request a clerk's entry of default or risk dismissal for want of prosecution. (Dkt. #10). The Commission subsequently requested entry of default, (Dkt. #13), which the Clerk entered, (Dkt. #14). The Commission now moves the Court for entry of default judgment against Moss, Royal, and Catalyst. (Dkt. #16).

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 55 sets forth certain conditions under which default may be entered against a party, as well as the procedure to seek the entry of

default judgment. FED. R. CIV. P. 55. The Fifth Circuit requires a three-step process for securing a default judgment. *New York Life Ins. Co. v. Brown*, 84 F.3d 137, 141 (5th Cir. 1996). First, a default occurs when a defendant has failed to plead or otherwise respond to the complaint within the time required by the Federal Rules of Civil Procedure. FED. R. CIV. P. 55(a); *New York Life Ins.*, 84 F.3d at 141. Next, an entry of default may be entered by the clerk when the default is established. FED. R. CIV. P. 55(a); *New York Life Ins.*, 84 F.3d at 141. Third, after an entry of default, a plaintiff may apply to the clerk or the court for a default judgment. FED. R. CIV. P. 55(b); *New York Life Ins.*, 84 F.3d at 141.

Rule 55(b)(2) grants a district court "wide latitude," and the entry of default judgment is left to the sound discretion of the trial court. *James v. Frame*, 6 F.3d 307, 310 (5th Cir. 1993); *see also Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998). A defendant, by his default, admits a plaintiff's well pleaded allegations of fact. *Nishimatsu Constr. Co., Ltd. v. Hous. Nat'l Bank,* 515 F.2d 1200, 1206 (5th Cir. 1975).

### III. DISCUSSION

In determining whether to enter a default judgment, courts utilize a three-part analysis: (1) "whether the entry of default judgment is procedurally warranted," (2) "whether a sufficient basis in the pleadings based on the substantive merits for judgment exists," and (3) "what form of relief, if any, a plaintiff should receive." *Graham v. Coconut LLC*, No. 4:16-CV-606, 2017 WL 2600318, at *1 (E.D. Tex.

June 15, 2017) (citing, among others, *Lindsey*, 161 F.3d at 893). The Court addresses each issue in turn.

## A. Default Judgment is Procedurally Warranted

The Court must first consider whether the entry of default judgment is procedurally warranted. *Lindsey*, 161 F.3d at 893. Relevant factors in making this determination include:

> [1] whether material issues of fact are at issue, [2] whether there has been substantial prejudice, [3] whether the grounds for default are clearly established, [4] whether the default was caused by a good faith mistake or excusable neglect, [5] the harshness of a default judgment, and [6] whether the court would think itself obliged to set aside the default on the defendant's motion.

*Id.*

On balance, these factors weigh in favor of granting default judgment against Moss, Royal, and Catalyst. When a defendant defaults, it admits to the plaintiff's well-pleaded allegations of fact. *Nishimatsu,* 515 F.2d at 1206. So there are no material issues of fact in dispute here. *See id.* The Commission's interests are prejudiced because Moss, Royal, and Catalyst have not answered the complaint or otherwise defended, bringing the adversarial process to a halt. *See United States v. Fincanon*, No. 7:08-CV-61-O, 2009 WL 301988, at *2 (N.D. Tex. Feb. 6, 2009) (citing *Lindsey*, 161 F.3d at 893). Moss, Royal, and Catalyst were served with process and failed to respond despite having ample notice and sufficient time to do so. So the grounds for default are clearly established, and a default judgment is not unusually harsh.

As to the remaining factors, no evidence of mistake or excusable neglect exists. Nor does there appear to be any basis on which the Court would be obligated to set aside the default. *See Lacy v. Sitel Corp.*, 227 F.3d 290, 292 (5th Cir. 2000) (describing the equitable principles a district court evaluates when considering whether good cause exists to set aside a default, including "whether the default was willful, whether setting it aside would prejudice the adversary, [] whether a meritorious defense is presented," and whether "the defendant acted expeditiously to correct the default" (cleaned up)). For these reasons, default judgment is procedurally appropriate here.

## B. Sufficient Basis in the Pleadings to Enter Default Judgment

The Court must next consider whether the Commission's complaint provides a sufficient factual basis to enter default judgment. *See Nishimatsu*, 515 F.2d at 1206 ("[A] defendant's default does not in itself warrant the court in entering a default judgment."). In determining whether there is a sufficient basis in the pleadings for judgment, courts in the Fifth Circuit "draw meaning from the case law on Rule 8." *Wooten v. McDonald Transit Assocs., Inc.*, 788 F.3d 490, 497 (5th Cir. 2015). Factual allegations in the complaint need only "be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 498 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The complaint must present "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," but "detailed

factual allegations" are not required.[1] *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

Applying this standard, the Court now considers the sufficiency of the Commission's claims.

### 1. Securities Offered and Sold

As a threshold matter, the facts alleged in the Commission's complaint establish that the "partnership" and "bridge loan" interests offered and sold by Moss, Royal, and Catalyst are securities as that term is defined under the Securities Act and the Exchange Act.

The Securities Act and the Exchange Act broadly define the term "security" to include a long list of financial instruments, including an "investment contract," the type of instrument at issue here. 15 U.S.C. §§ 77b(a)(1), 78c(a)(10). An investment contract qualifies as a security if it meets three elements: "(1) an investment of money; (2) in a common enterprise; and (3) on an expectation of profits to be derived solely from the efforts of individuals other than the investor." *SEC v. Arcturus Corp.*, 928 F.3d 400, 409 (5th Cir. 2019) (citing *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298– 99, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), and quoting *Williamson v. Tucker*, 645 F.2d 404, 417 (5th Cir. 1981)). When applying this test—that is, the *Howey* test—courts disregard "legal formalisms" and instead "focus on the substance of the deal." *Id.* (citing *Reves v. Ernst & Young*, 494 U.S. 56, 61, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990)).

---

[1] To be clear, this low threshold is less rigorous than the plausibility standard under Rule 12(b)(6). *Wooten*, 788 F.3d at 498 n.3 ("declin[ing] to import Rule 12 standards into the default-judgment context" because "a default is the product of a defendant's *inaction*" rather than the invocation of Rule 12's defense).

Even when contracts "superficially resemble private commercial transactions" and lack "the formal attributes of a security," they can still qualify as securities. *Id.* (quoting *Youmans v. Simon*, 791 F.2d 341, 345 (5th Cir. 1986)).

Here, all three prongs of the *Howey* test are met. The first prong is satisfied because investors paid money to obtain their partnership and bridge-loan interests. (Dkt. #1 ¶¶ 1–4). As to the second prong, "commonality is evidenced by the fact that the fortunes of all investors [were] inextricably tied to the efficacy of" the promoters' efforts. *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 479 (5th Cir. 1974). In this case, the investors' purported potential returns depended on the success of the purported oil-and-gas projects, and the offerings were marketed as ventures in which the investors would benefit from the claimed expertise and efforts of the promoters. (Dkt. #1 ¶¶ 20–21, 29–30, 38, 47). Thus, commonality exists. *See Koscot*, 497 F.2d at 479. And finally, because investors had no right to participate in management of the projects, they had a reasonable expectation that profits would be derived solely from the efforts of individuals other than themselves. (Dkt. #1 ¶¶ 21, 34, 42, 54). So the third prong of the *Howey* test also is met.

In sum, the offerings at issue are securities under the Exchange Act and the Securities Act.

### 2. Violations of Section 10(b) of the Exchange Act, Rule 10b–5, and Section 17(a) of the Securities Act

The Commission's allegations also establish that Moss, Royal, and Catalyst are liable for violating Section 10(b) of the Exchange Act, Rule 10b–5 thereunder, and Section 17(a) of the Securities Act.

Section 10(b) of the Exchange Act and Rule 10b–5 "make it unlawful for any person, in connection with the purchase or sale of a security, directly or indirectly, to (a) 'employ any device, scheme, or artifice to defraud'; (b) 'make an untrue statement of a material fact' or a material omission; or (c) 'engage in any act, practice, or course of business which operates . . . as a fraud or deceit upon any person.'" *SEC v. Shavers*, No. 4:13-CV-416, 2014 WL 4652121, at *8 (E.D. Tex. Sept. 18, 2014) (quoting 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–5). To establish violations of Section 10(b) and Rule 10b–5 for material representations or misleading omissions, the Commission must prove three elements: "(1) material misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of securities, (3) made with scienter." *SEC v. Sethi*, 910 F.3d 198, 206 & n.4 (5th Cir. 2018) (quoting *SEC v. Seghers*, 298 F.App'x 319, 327 (5th Cir. 2008) (per curiam)).

Similarly, Section 17(a) of the Securities Act makes it unlawful, in the offer or sale of securities, to (1) employ any device, scheme, or artifice to defraud; (2) obtain money or property by means of any material misstatements or omissions; or (3) engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit. 15 U.S.C. §77q(a); *see also SEC v. Spence & Green Chem. Co.*, 612 F.2d 896, 903 (5th Cir. 1980) ("[T]he proscriptions of section 17(a) are substantially the same as those of section 10(b) and rule 10b–5[.]"). Like Section 10(b) and Rule 10b–5, Section 17(a)(1) violations require a showing of scienter, whereas Sections 17(a)(2) and 17(a)(3) only require negligence. *Aaron v. SEC*, 446 U.S. 680, 696–97, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980); *see also Sethi*, 910 F.3d at 206.

A misrepresentation or omission is material if it is "reasonably calculated to influence the decisions of an investor—institutional or otherwise—in its trading in securities." *SEC. v. Gann*, 565 F.3d 932, 937 (5th Cir. 2009). Put another way, there must be "a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 359 (5th Cir. 2002) (cleaned up).

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Gann*, 565 F.3d at 936 (quotation omitted). Either intent or severe recklessness will suffice. *Sethi*, 910 F.3d at 206. Severe recklessness is defined as "those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care." *Id.*

Here, the well-pleaded allegations in the Commission's complaint establish that Moss, Royal, and Catalyst made misstatements and omitted information to unwitting investors in their securities offerings. These misrepresentations include claims that prior oil wells had been commercial successes when, in fact, none had been profitable, (Dkt. #1 ¶¶ 27, 38, 47–48), and unfounded promises of guaranteed returns, (Dkt. #1 ¶¶ 3, 31, 37, 46). Sales materials also contained misleading statements about project management and consulting experts. (Dkt. #1 ¶¶ 28–29). For example, some materials listed a cold-caller as the President of Genesis and David Glass as the company's CEO when, in fact, Moss possessed ultimate control over business operations at Genesis. (Dkt. #1 ¶ 29). The materials also stated that

Dan Morrison, who was identified as having extensive industry experience, was a "Director" of Royal. (Dkt. #1 ¶ 29). But Morrison was never a director of Royal; nor did he ever perform any consulting services for the partnerships. (Dkt. #1 ¶ 29).

True, Moss's involvement was not completely concealed. He was identified in sales materials as a "consultant," and his twenty-two years of experience in the oil-and-gas industry were touted as a benefit. But investors were not informed that, within the same twenty-two years, Moss was convicted of securities fraud for selling oil-and-gas securities in a company he owned and controlled. (Dkt. #1 ¶¶ 30, 38). Because all of these misstatements and omissions relate to issues fundamental to the nature and risks of the offerings, they would have "significantly altered the total mix of information" available to any reasonable investor. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011) (quotation omitted). In other words, they were material. *See id.*; *Gann*, 565 F.3d at 937.

The Commission's allegations also show that Moss, Royal, and Catalyst made these material misstatements and omissions with scienter. Moss and his companies repeated known untruths and omitted critical information about the investments, intentionally defrauding investors and raising more than $5.7 million as a result. (Dkt. #1 ¶ 1). They knew, for instance, that no previous well had produced profit for a single investor. But they said the opposite. (Dkt. #1 ¶¶ 27, 31, 46–47). They also intentionally misrepresented basic facts about Moss's involvement with the projects and knowingly concealed his criminal history. (Dkt. #1 ¶¶ 30, 38, 51). This course of business, as detailed in the complaint, operated as a fraud designed to siphon

investors' funds from the companies and into Moss's own pocket. (Dkt. #1 ¶¶ 2, 3, 4, 32). Such conduct, on its face, was intentional or, at the very least, severely reckless.

At bottom, the Commission's allegations establish that Moss, Royal, and Catalyst made material misstatements and omissions and engaged in a course of business designed to deceive and defraud investors in connection with the offer, purchase, or sale of securities. The allegations in the complaint also support the conclusion that they did so with a high degree of scienter. *See Sethi*, 910 F.3d at 206; *Gann*, 565 F.3d at 936. Thus, the Commission is entitled to default judgment on its claims that Moss, Royal, and Catalyst violated Section 10(b) of the Exchange Act, Rule 10b–5, and Section 17(a) of the Securities Act.

### 3.  Moss's Violations of Section 15(a) of the Exchange Act

A sufficient basis in the pleadings likewise exists to enter judgment on the Commission's claim that Moss violated Section 15(a) of the Exchange Act.

Section 15(a) prohibits unregistered brokers or dealers from effecting or attempting to effect any securities transaction through interstate commerce. 15 U.S.C. § 78o(a)(1). A violation of Section 15(a)(1) does not require a showing of scienter. *SEC v. Rabinovich & Assocs., LP*, No. 07 Civ. 10547(GEL), 2008 WL 4937360, at *5 (S.D.N.Y. Nov. 18, 2008); *cf. Eastside Church of Christ v. Nat'l Plan, Inc.*, 391 F.2d 357, 361–62 (5th Cir. 1968) (concluding, without making finding of scienter, that the defendant violated Section 15(a)(1)).

A "broker" is "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4)(A). To determine whether

an individual qualifies as a broker, most courts apply a list of nonexclusive factors: (1) "regular participation in securities transactions," (2) "employment with the issuer of the securities," (3) "payment by commission as opposed to salary," (4) "history of selling the securities of other issuers," (5) "involvement in advice to investors," and (6) "active recruitment of investors." *SEC v. Collyard*, 861 F.3d 760, 766 (8th Cir. 2017) (quoting *SEC v. George*, 426 F.3d 786, 797 (6th Cir. 2005)); *see also SEC v. Hui Feng*, 935 F.3d 721, 731–32 (9th Cir. 2019) (same); *SEC v. Imperiali, Inc.*, 594 F.App'x 957, 961 (11th Cir. 2014) (per curiam) (same).

Although not all the relevant factors are present here, most are. As detailed in the complaint, Moss regularly solicited potential investors and closed sales between them and the issuers, (Dkt. #1 ¶¶ 2, 23, 47); recommended to investors that they invest in the partnership and bridge-loan securities, (Dkt. #1 ¶ 24); drafted sales materials for distribution to investors that made representations about the merits of the investments, (Dkt. #1 ¶¶ 20–30, 38, 47); controlled the bank accounts into which the offering proceeds were received, (Dkt. #1 ¶ 32); and compensated himself through investor funds, (Dkt. #1 ¶¶ 3–4, 32). The totality of the circumstances thus reveals that Moss acted as a broker in connection with the offerings at issue. *See Eastside Church of Christ*, 391 F.2d at 361 (concluding that evidence "conclusively" showed the defendant was a broker where the defendant assisted a bond issuer with legal work related to a bond issue, handled necessary paperwork, acted as a trustee and financial agent of the property, and managed the bond sales program that involved sales across the country).

13

Accepting the well-pleaded allegations as true, Moss was a broker within the meaning of Section 15(a) of the Exchange Act. He was therefore required to register as such. 15 U.S.C. § 78o(a)(1). Because of his failure to do so, (Dkt. #1 ¶ 59), he violated Section 15(a).

## C. Appropriateness of Relief

In awarding relief, a "default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." FED. R. CIV. P. 54(c). And in the context of a default judgment, damages are normally not awarded without an evidentiary hearing. *James*, 6 F.3d at 310. But this general rule does not apply—that is, a hearing is unnecessary—when the amount of damages can be determined with a mathematical calculation by reference to the pleadings and supporting documents. *Id.* With these principles in mind, the Court turns to the Commission's requests for injunctive relief, disgorgement plus prejudgment interest, and civil penalties. (Dkt. #1 at 15); (Dkt. #16 at 2).

### 1. Permanent Injunction

As to the first form of relief, the Commission seeks permanent injunctions that would enjoin Moss, Royal, and Catalyst from violating Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b–5. The Commission also asks the Court to permanently enjoin Moss from (1) violating Section 15(a) of the Exchange Act and (2) participating in the issuance, purchase, offer, or sale of any security in an unregistered transaction; provided, however, that such injunction shall not prevent

14

him from purchasing or selling securities for his own personal account. (Dkt. #16 at 2, 12–13).

Section 20(b) of the Securities Act and Section 21(d) of the Exchange Act authorize the Commission to seek injunctive relief upon a "proper showing" that a defendant "is engaged or is about to engage" in violations of the securities laws. *SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. 1981) (quotations omitted). "A permanent injunction is appropriate only if a defendant's past conduct gives rise to an inference that, in light of present circumstances, there is a reasonable likelihood of future transgressions." *SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 784 (5th Cir. 2017) (quotation omitted). In determining whether a defendant should be permanently enjoined, a court must consider the "(1) egregiousness of the defendant's conduct, (2) isolated or recurrent nature of the violation, (3) degree of *scienter*, (4) sincerity of defendant's recognition of his transgression, and (5) likelihood of the defendant's job providing opportunities for future violations." *Gann*, 565 F.3d at 940. No single factor is dispositive; rather, it is "the sum of the circumstances surrounding the defendant and his past conduct that governs whether to grant or deny injunctive relief." *Zale Corp.*, 650 F.2d at 720.

Accepting the Commission's alleged facts as true, Moss, Royal, and Catalyst engaged in egregious and repeated violations of the securities laws committed knowingly or at least with severe recklessness. This recurrent conduct, for the reasons discussed above, was taken with a high degree of scienter. And because Moss, Royal, and Catalyst have not participated in this action, they have neither

15

demonstrated any recognition of the wrongfulness of their conduct nor provided any assurances that they will not commit future violations. Finally, it is important to note that Moss is a repeat offender, having been convicted of securities fraud in 2004. (Dkt. #1 ¶ 2). Considering these circumstances, there is a reasonable likelihood that Moss, Royal, and Catalyst will commit future violations of the securities laws absent an injunction. A permanent injunction against each of them to prevent such violations is therefore warranted. *See Life Partners Holdings, Inc.*, 854 F.3d at 784.

For these reasons, the Commission's request for a permanent injunction against Moss, Royal, and Catalyst is granted.

### 2. Disgorgement and Prejudgment Interest

The Commission also seeks disgorgement of Moss's ill-gotten gains plus prejudgment interest. (Dkt. #1 at 15); (Dkt. #16 at 14–16).

Disgorgement "is an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs." *Allstate Ins. Co. v. Receivable Fin. Co.*, 501 F.3d 398, 413 (5th Cir. 2007) (quotation omitted). A district court retains "broad discretion in fashioning the equitable remedy of a disgorgement order." *SEC v. Huffman*, 996 F.2d 800, 803 (5th Cir. 1993). And the Supreme Court has made clear that a disgorgement award equal to the wrongdoer's net profit is permissible under the securities laws. *Liu v. SEC*, 140 S.Ct. 1936, 1942–43 (2020).

In actions brought by the Commission, "disgorgement need only be a reasonable approximation of profits causally connected to the [securities] violation." *Allstate Ins. Co.*, 501 F.3d at 413 (quoting *SEC v. First City Fin. Corp.*, 890 F.3d 1215,

1231 (D.C. Cir. 1989)). The Commission has the initial burden of showing that its requested disgorgement amount reasonably approximates the amount of profits connected to the violation. *First City*, 890 F.2d at 1232; *SEC v. Rockwall Energy of Tex.*, LLC, No. H-09-4080, 2012 WL 360191, at *3 (S.D. Tex. Feb. 1, 2012). Once the Commission makes that showing, the burden shifts to the defendant to "demonstrate that the disgorgement figure was not a reasonable approximation." *First City*, 890 F.2d at 1232.

Because the aim of disgorgement is to divest all ill-gotten gains from the illegal conduct, disgorgement typically includes prejudgment interest, thus preventing the wrongdoer from otherwise profiting off illicit proceeds. *SEC v. AmeraTex Energy, Inc.*, No. 4:18-CV-129, 2021 WL 1061395, at *3 (E.D. Tex. Mar. 18, 2021); *see also SEC v. Sargent*, 329 F.3d 34, 40–41 (1st Cir. 2003)). Prejudgment interest is ordinarily calculated according to the Internal Revenue Service's underpayment rate. *SEC v. Helms*, No. A-13-CV-1036 ML, 2015 WL 5010298, at *19 (W.D. Tex. Aug. 21, 2015) (citing 26 U.S.C. § 6621(a)(2)); *see also SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996) (approving application of IRS underpayment rate for calculating prejudgment interest on amounts disgorged due to securities violations).

Here, the Commission seeks disgorgement from Moss in the amount of $3,241,889, the amount that Moss misappropriated from investor funds to his personal use. Based on a sworn declaration supporting its motion for default judgment, the Commission has established that this amount is a reasonable approximation of the ill-gotten gains, minus businesses expenses, that Moss received

through his violations of the securities laws. (Dkt. #16-2). Because Moss has failed to contest this action, he has produced no evidence that the Commission's calculation is inaccurate. *See First City*, 890 F.2d at 1232 (explaining that once a reasonable approximation is established, the burden then shifts to the defendant to show that the approximation is incorrect). Thus, the Court concludes that Moss is liable for disgorgement in the amount of $3,241,889.

Because disgorgement of Moss's ill-gotten gains is appropriate, so is prejudgment interest. *See Helms*, 2015 WL 5010298, at *20. As noted above, the Commission requests prejudgment interest in the amount of $524,526.53. To support this amount, the Commission has provided a copy of Moss's Prejudgment Interest Report, which contains a table with calculations based on the IRS's underpayment tax rate. (Dkt. #16-3). The Commission arrived at the requested amount by taking the tax underpayment rate from February 2018 (the last month in which Moss received investor funds) through July 2021 (the date of the instant motion) and applying the rate to the principal of $3,241,889.27. (Dkt. #16-3). Based on this evidence—which supports the relief requested—and Moss's failure to contest it, the Court awards prejudgment interest in the amount of $524,526.53.

### 3. Civil Penalties

Finally, the Commission seeks civil penalties against Moss, Royal, and Catalyst. (Dkt. #1 at 15); (Dkt. #16 at 16–18).

Both the Securities Act and the Exchange Act provide for a three-tiered structure of civil penalties. 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B). The steepest penalties

enumerated in the third tier may be imposed when the violation involved (1) "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and (2) "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii). The maximum penalty a court may award is the greater of the gross amount of pecuniary gain or the amount set by the applicable statutory tier. 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii); 17 C.F.R. 201.1001 (adjusting penalties for inflation).

Although the maximum penalty is capped by statute, the amount imposed within that limit is left to a district court's discretion. *AmeraTex Energy*, 2021 WL 1061395, at *4 (citing *SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005)). Civil penalties, like injunctions, are intended to deter future violations. Accordingly, courts look to similar factors to determine whether a civil penalty is warranted:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*Id.* at *4 (quoting *Helms*, 2015 WL 5010298, at *21); *see also SEC v. Offill*, No. 3:07-CV-1643-D, 2012 WL 1138622, at *3 (N.D. Tex. Apr. 5, 2012) (same).

Moss, Royal, and Catalyst participated in a course of business that involved fraud and deceit on a large scale and in clear disregard of the securities laws. Their actions, as discussed above, were not only egregious but taken with a high degree of scienter. And their conduct was not isolated; it persisted for several years across

multiple offerings. Nor was the harm insubstantial. To the contrary, their conduct resulted in investors losing millions of dollars. *See, e.g.*, (Dkt. #16-1 ¶ 8 (attesting, among other things, that "no investors were paid back their principal investment from any of these oil and gas projects in which they were invested"). Nothing in the record suggests that Moss, Royal, or Catalyst has acknowledged their wrongdoing. And finally, as the Commission points out, this was not Moss's first securities fraud offense. Because Moss's, Royal's, and Catalyst's violations of the Securities Act and the Exchange Act involved fraud, deceit, and deliberate or reckless disregard of regulatory requirements that directly or indirectly resulted in substantial losses to investors, third-tier penalties are appropriate. 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii).

For the sake of consistency among the entity defendants controlled by Moss, the Court imposes third-tier civil penalties in the requested amount of $192,768, each, against Royal and Catalyst. This penalty is equal to that already ordered against Genesis. (Dkt. #12 at 3). As to Moss—due to the impropriety of his recidivist conduct—the Court imposes a civil penalty commensurate with the amount of his gross pecuniary gain: $3,241,889. *See* (Dkt. #16-2 ¶ 5).

## IV. CONCLUSION

For the foregoing reasons, the SEC's Motion for Default Judgment Against Defendants Ronnie Lee Moss, Jr.; Royal Oil, LLC; and Catalyst Operating, LLC., (Dkt. #16), is **GRANTED**. The Court will enter its final judgment as to Moss, Royal, and Catalyst by separate order.

So ORDERED and SIGNED this 11th day of March, 2022.

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE